## Bailey v. Commonwealth.

(Decided October 1, 1918.)

### Appeal from Larue Circuit Court.

1. **Criminal Law—Self-Defense—Question for Jury.**—If the conduct of a defendant in a criminal prosecution is such as to legally take away from him the right of self-defense, it is the duty of the court to so tell the jury by a properly prepared instruction qualifying the one of self-defense; and where the facts are sufficient to authorize the jury to find that the defendant's conduct deprives him of the right of self-defense, it is not error for the court to submit that question to the jury.

2. **Criminal Law—Self-Defense—Evidence.**—Evidence examined in this case and found to be sufficient to uphold the action of the court in qualifying the right of self-defense, as indicated above.

H. L. JAMES and O. M. MATHER for appellant.

CHARLES H. MORRIS, Attorney General, and HENRY F. TURNER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On his trial under an indictment for the murder of B. Carter, returned by the grand jury of Larue county, the appellant, Joe Bailey, was found guilty of voluntary manslaughter and his punishment fixed at confinement in the penitentiary for eight years. He seeks by this appeal a reversal of the judgment pronounced on that verdict, insisting upon a number of alleged errors in his motion for a new trial, but all of them are practically abandoned by his counsel except the alleged error of the court in the qualification which was attached to the self-defense instruction. That instruction is in the usual and approved form, and no complaint is made of it, the objection being directed to the qualification, which is in these words: "But if the jury believe from the evidence beyond a reasonable doubt that the defendant, Joe Bailey, when he met the said G. B. Carter, commenced the difficulty by shooting at him, or that the defendant, Joe Bailey, or the defendants, Joe and Richard Bailey, met the deceased, and both parties were armed and determined on a conflict, and did engage in such conflict by mutual consent, then in either such event the defendant, Joe Bailey, cannot rely on the right of self-defense,"

The objection is not directed to the verbiage of the qualification, but it is strongly insisted that the evidence

did not authorize it at all, and it should have been entirely omitted.

In disposing of the point raised it becomes necessary to make a brief statement of the testimony, especially that introduced by the Commonwealth, for if it was sufficient to authorize the jury to find the facts embodied in the qualification, there was no error committed; and conversely, if such evidence did not authorize the jury to find such facts, the court was in error, and a new trial should have been granted. Canter v. Commonwealth, 176 Ky. 360; Hobson on Instructions, section 765, and authorities referred to.

The defendant is one of seven children who survived their mother, Mrs. Elizabeth Bailey. The deceased lived on an adjoining farm to that upon which defendant's mother resided at the time and for a long while prior to her death, and upon which the defendant and his brothers and sisters were practically if not entirely reared. Mrs. Bailey, before her death, executed a will which was witnessed by the deceased, B. Carter. The four older children, one of whom was the defendant, were dissatisfied with the provisions of the will and claimed that the deceased had influenced their mother to discriminate in the disposition of her property against them and in favor of her three younger children. This culminated in a contest over the will, which resulted in a judgment setting it aside. Upon the trial of that contest the deceased appears to have been not only a witness for, but an active participant on behalf of the contestees. There is nothing to show that he did anything unjustifiable, or that he was any more active than it appeared to him to be necessary in carrying out the conscientious belief that the will was valid and should be probated. Nevertheless, these conditions produced a bitter estrangement between the four older children and the deceased, and on a number of occasions when they would meet there would be a war of words, with opprobrious epithets used by each party toward the other, but no personal encounters. The defendant and the deceased are shown to have made threats toward each other and for some time immediately prior to the killing they both went armed. One of the threats which the defendant is alleged to have made against the deceased was that "What B. Carter needed was a double-barreled shot gun, and I am the man to give it to him," or that in substance. The testimony as

a whole convinces us that the defendant and his brother, Dick Bailey, who was jointly indicted with him, but whom the jury acquitted, were much more bitter and demonstrative than was the deceased.

The tragedy occurred on Wednesday, the sale of the personal property of Mrs. Elizabeth Bailey having taken place on the Saturday before. On the day of the sale some angry words passed between Dick Bailey and the deceased, growing out of the fact that the former claimed to own some property which the deceased insisted belonged to the estate of the widow and should be sold as such. The defendant was at the sale and there were some manifestations of anger by him and the deceased toward each other. On the day of the homicide the defendant and one Luther Clayton went in a buggy to the house of Turner Bailey to get a jug of whiskey which the latter, in company with Bill Skaggs and Elbert Brown, had some time that day hidden in a fence corner near Turner Bailey's home. They failed to find it, but the defendant got into a quarrel with his brother Turner, who was one of the three younger children, and threatened to draw his double-barreled shotgun, which he had in the bottom of the buggy. For some reason he did not use the gun on his brother Turner, and he and Clayton went to the house of Bill Conner to find Skaggs and to learn from him what had become of the whiskey. This trip proved fruitless, and the two returned to the home of Dick Bailey in order to get him, as they claimed, to go with them to church at Buffalo, about three miles distant. Before defendant and Clayton started on their hunt for the whiskey the deceased and John Bailey, the defendant's youngest brother, passed defendant's home in a wagon, taking some apples to Magnolia. The defendant, his brother Dick and Clayton were there at the time. The deceased and Clayton stopped their wagon in front of the house and there was a conversation of some twenty minutes or more between Dick Bailey, Clayton and the deceased. It is claimed that the deceased took a drink of whiskey at that place from a bottle which he had in one of the apple barrels, but that defendant declined to take a drink, although the deceased offered him one, and when the deceased and John Bailey left they went on in the direction of Magnolia. The defendant and Clayton succeeded in inducing Dick Bailey to go to church with them at Buffalo, but before starting on the journey Dick

Bailey did the chores around the house and hitched one of his horses to the buggy, leaving the defendant's horse which he and Clayton had been driving in Dick's pasture. The three had traveled only about a quarter of a mile when they met the deceased and John Bailey returning from Magnolia. The road was narrow and it was with some difficulty that the buggy passed the wagon. The Commonwealth proved that Dick Bailey said on that occasion: "You sons of bitches didn't give half the road," when John Bailey stated that they had given half the road, but no one claims that the deceased said anything at that time. Immediately after passing the wagon the three in the buggy abandoned the idea of going to church and concluded to return to the home of Dick Bailey, from whence they had started, and at a point about two hundred yards from where they passed the wagon they turned around and in returning passed the wagon a short distance from Dick Bailey's house. When they arrived at the house Dick Bailey and the defendant immediately alighted from the buggy, the former throwing the lines over the gate post and starting across the road into a field where he had some stock. The defendant started down by the side of the road toward his home, taking his shotgun with him, but leaving Clayton in the buggy. At that time Clayton, whom the evidence shows beyond question to be friendly toward the defendant, asked him what he was going to do, whereupon the defendant said "Keep still," and Clayton said "I wouldn't do that." When Dick and the defendant got out of the buggy the wagon in which the deceased was riding was approaching, and only about fifty or seventy-five yards distant. It was then practically dark, and when the wagon, according to the testimony of John Bailey, who was driving, had gotten thirty or forty feet past Dick Bailey's house the defendant said: "You sons of bitches get out of the road," and thereupon fired at the deceased, which frightened the team and it ran away. There were other shots in immediate succession, some of them so close together as to scarcely be distinguishable, the last one being another shot fired by the defendant at John Bailey, who jumped or was thrown from the wagon as the horses lunged forward. The deceased fell in the wagon, where his dead body was afterward found, but no one knows whether he was killed immediately, al-

though the physician says that the wound was sufficient to produce instant death.

Defendant and his witnesses say that they saw the pistol of the deceased at the time they first met him, and before they turned back on their trip to church. John Bailey testified in substance that as they were about to pass the house of Dick Bailey, just before the shooting, deceased said, "Say nothing and drive on. I will attend to them." It had rained on that morning, and the road was very muddy. Both Dick Bailey and the defendant swear that they were afraid of the deceased and always sought to avoid meeting him. The only excuse given for abandoning the trip to the church and to return to Dick Bailey's was that Clayton, just before meeting the deceased, suggested that he wanted to go back to Turner Bailey's and spend the night, but the deceased and Dick Bailey insisted that they continue their journey to church, and only consented to abandon it after meeting and passing the deceased. No explanation is given by the defendant of his sudden notion to leave the company of his brother Dick and Clayton when he got out of the buggy at Dick's house and walk home in a muddy road, leaving behind both his horse and his buggy, and traveling immediately in front of the deceased, whom he knew to be armed and of whom he claimed to be afraid. Dick Bailey explains his crossing to the other side of the road with a pistol by saying that he wanted to water and put into the stable a mare which he was afraid would break out of the lot, and which duties he had forgotten to perform before starting to church.

Upon the question of who fired the first shot John Bailey testified that it was fired by the defendant. A nearby neighbor swore that the first shot sounded like one from a shotgun rather than a pistol. The Commonwealth's testimony would indicate that defendant was behind a tree when he fired his first shot, but he denies this, and says that he was some four or six feet distant from the tree. There was the mark of a bullet from a pistol on one side of that tree, and a pistol ball lodged in the knuckle of defendant's right thumb. Although there are other facts and circumstances in the case corroborating the Commonwealth's contention that the defendant intended to and as a matter of fact did bring on the difficulty resulting in the killing, surely the facts which we have narrated are amply sufficient to authorize

the submission of that issue to the jury. Aside from the direct testimony of Clayton and John Bailey, we have the undisputed fact that both the defendant and Dick Bailey knew that the deceased had gone to Magnolia, and would return some time that afternoon. They saw him returning when they met him on the road as they had started to church. Immediately thereafter they turned around, following him, and without any satisfactory explanation they hurriedly got out of the buggy, started down the road just in front of the deceased, both armed, and this conduct on their part was under such circumstances as not to be susceptible of any satisfactory explanation, nor indeed was any given. To our minds there was not only sufficient evidence to authorize the court to include in the self-defense instruction the qualification complained of, but we think the jury was authorized in finding the facts to be as therein incorporated, and that their verdict is sustained by the great preponderance of the testimony.

Suggestion is made that the court erred in the admission and rejection of testimony, but only a brief reference is made to this by counsel for appellant, and our attention is directed to no ruling of the court under this head which is claimed to be erroneous. However, we have closely read all of the testimony, and feel fully authorized in saying that the court conducted the trial with unusual vigilance and care, and protected the rights of each party as fully as it was possible to do, considering the number of witnesses and the length of the trial.

Upon the whole case we are deeply impressed that the rights of the defendant were not prejudiced by any error complained of; that the jury was lenient in its verdict, and that according to the testimony he is to be congratulated rather than commiserated.

Wherefore, the judgment is affirmed.